979 P.2d 586

Duncan BROWN, Plaintiff–Appellant,

v.

Stephen L. THOMPSON; Vaughan Tyndzik; State of Hawai'I, Defendants–Appellees,

and

John Does 1–10; Doe Corporations 1–10; and Doe Corporation Agencies 1–10, Defendants.

No. 21528.

Supreme Court of Hawai'i.

July 7, 1999.

As Amended July 13, 1999.

Jack Schweigert and Rory S. Toomey, on the briefs, Honolulu, for the plaintiff-appellant Duncan Brown.

Pamela Matsukawa, Deputy Attorney General, on the briefs, for the defendants-appellees Stephen L. Thompson, Vaughan Tyndzik, and State of Hawai'i.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by LEVINSON, J.

The plaintiff-appellant Duncan Brown appeals from the final judgment of the first circuit court, filed on April 17, 1998, in favor of the defendants-appellees Stephen Thompson, Vaughan Tyndzik, and the State of Hawai'i (collectively, "the defendants") and against Brown with regard to his claims concerning the cost of the impoundment and subsequent disposal of two vessels owned by Brown. Brown argues that the circuit court erred because: (1) the impoundment of vessel HA 7430 C (hereinafter "vessel 7430") (a) contravened Brown's right to procedural due process, in violation of article I, section 5 of the Hawai'i Constitution (1978) and the fifth amendment to the United States Constitution, and (b) amounted to an unconstitutional taking; (2) the impoundment of vessel 7430 violated the provisions of HRS §§ 200–48 (1993)[1] and 200–49 (1993)[2] so as to support

---

1. HRS § 200–48 provides in relevant part:
 **Derelict vessel.** A vessel which has been left unattended for a continuous period of more than twenty-four hours is a derelict if:
 (1) The vessel is sunk or in immediate danger of sinking, is obstructing a waterway, or is endangering life or property. . . .

2. At the time of the impoundments, HRS § 200–49 provided in relevant part:

 **Disposition of derelict vessel.** The chairperson [of the board of land and natural resources] may cause a derelict vessel to be immediately taken into custody. Upon taking

claims of conversion and trespass; (3) the assessment of fees against Brown in connection with the impoundments of vessel 7430 and vessel HA 9362 E (hereinafter "vessel 9362") was unlawful under the circumstances of this case; (4) the circuit court erroneously admitted certain evidence; and (5) some of the circuit court's findings of fact were erroneous.

We agree with Brown's point of error (1)(a) and in part with his point of error (3). Brown's points of error 1(b), (2), (4), and (5) are without merit. Accordingly, we vacate the circuit court's final judgment and remand this matter for the entry of a judgment: (1) in favor of Brown and against the defendants, (a) granting Brown's prayer for a declaration that his right to procedural due process was violated with respect to the impoundment and disposal of vessel 7430, and (b) denying the defendants' counterclaim for the amounts assessed for the impoundment and disposal of vessel 7430; and (2) in favor of the defendants and against Brown, (a) granting the defendants' counterclaim in the amount of $290.00, to be assessed against Brown for the impoundment of vessel 9362, and (b) denying Brown's claims for injunctive relief and damages.

## I. BACKGROUND

As indicated above, the present appeal arises out of the impoundment by the defendants of two vessels owned by Brown, vessel 7430 and vessel 9362, which he kept at Ke'ehi Small Boat Harbor. On December 28, 1995, Brown filed a complaint in the first circuit court against the defendants, seeking declaratory and injunctive relief, as well as nominal damages, based on the impoundment of vessel 7430. The defendants filed an answer and counterclaim on June 10, 1996, praying

custody of a derelict vessel the chairperson shall concurrently:
 (1) Publish a notice of intended disposition, once, in a newspaper of general circulation;
 (2) When possible, post a notice of intended disposition on the vessel; and
 (3) Serve a duplicate original of the notice of intended disposition by certified mail, return receipt requested on:
 (A) The registered owner of the vessel, if known, at the registered owner's last known address. . . .

for an order directing Brown to pay the fees and costs incurred by the State of Hawai'i (the State) in relation to the impoundment of both vessel 7430 and vessel 9362. The following evidence regarding the two vessels was adduced at trial.

### A. Vessel 7430

Vessel 7430 was a catamaran sailboat, for which the Department of Land and Natural Resources, Division of Boating and Ocean Recreation (DOBOR), had issued (1) a mooring permit for the offshore area of Ke'ehi Harbor and (2) a "Principal Habitation and Harbor Resident Permit."

On December 4, 1993, Brown left Honolulu for a two-week visit to the mainland. Brown notified Linda Thorp, another Ke'ehi Harbor resident and the individual listed as Brown's contact person at the harbormaster's office, of his departure.

On the morning of December 8, 1993, the harbormaster at Ke'ehi Harbor, Tyndzik, noticed that the starboard side of vessel 7430 was sinking and was submerged "halfway down." Also on the morning of December 8, 1993, Fraser Innis, a carpenter hired by Brown to perform repairs on Brown's vessels when Brown went out of town, noticed that one hull of vessel 7430 was sinking. Innis testified that he spent one-and-a-half hours pumping water out of the sinking hull, but that his pump lost power before he was able to complete the repair.

On the morning of December 9, 1993, Tyndzik again examined vessel 7430. He determined that no one had recently cared for it. Tyndzik believed that vessel 7430 was in danger either of sinking and blocking the waterway or of breaking up and causing a debris problem. Later that day, Tyndzik

. . . .

If the vessel is not repossessed within twenty days after the publication or mailing of the notice, whichever occurs later, the vessel may be disposed of by negotiated sale except that, when two or more purchasers indicate an interest in purchasing the vessel, the vessel will be sold at public auction to the highest bidder. If no purchaser expresses a desire to purchase the vessel, the vessel may be destroyed.

returned for a second look at vessel 7430 and observed that the weight of the starboard hull was causing the port hull to rise out of the water. Tyndzik also noted rot and "extended biofouling" on the bottom of the hull, as well as cracking and delamination on both hulls.

Also on the morning of December 9, 1993, Thorp and Innis met to discuss what they might do about vessel 7430. Thorp and Innis both testified that they were planning to pump the excess water out of vessel 7430 that day. While they were talking, they saw Tyndzik approach vessel 7430. Thorp went out in her dinghy and informed Tyndzik that she and Innis would take care of vessel 7430. Tyndzik informed Thorp that she was too late and that he was planning to impound the vessel. Innis then went out in the dinghy to talk with Tyndzik and was likewise told that Tyndzik planned to impound the vessel.

Tyndzik contacted the Oʻahu District Small Boat Harbors Manager, Thompson, who authorized the impoundment of vessel 7430. Tyndzik returned to vessel 7430 on the afternoon of December 9, 1993, with an impound notice. At about 3:45 p.m., Tyndzik called into the Keʻehi Harbor office to announce that vessel 7430 was in tow. Vessel 7430 was subsequently secured in the impound yard.

Brown returned to Honolulu on December 18, 1993. Brown testified that he went to Keʻehi Harbor to see about his boat on December 29, 1993. At that time, Thompson informed Brown that vessel 7430 had been impounded. Brown subsequently encountered Tyndzik in the parking lot and asked Tyndzik whether he could retrieve his boat. Tyndzik explained that Brown could not recover vessel 7430 without paying the required fees. Brown notified Tyndzik that he would be leaving for sea the next day and would be gone for about a month. Brown testified that he was unable to resolve matters with Tyndzik on December 29, 1993, because Tyndzik told him that "it would take a couple of days to just figure out how much money [Brown] owed." On December 30, 1993, Brown apparently left Honolulu for a one-month sea voyage in connection with his

employment as a deck officer in the merchant marine.

Meanwhile, on December 27, 1993, a marine surveyor inspected vessel 7430 and estimated its value to be "none."[3] On January 3, 1994, Thompson mailed a certified letter to Brown's Honolulu post office box, informing Brown that vessel 7430 had been declared derelict. The letter noted in relevant part that,

> [i]n accordance with section 200–48, Hawaii Revised Statutes, the vessel described below is declared a derelict as of 12–09–93.... Custody of the vessel shall be returned to the person(s) entitled only upon payment of all fees and costs due the Division of Boating and Ocean Recreation and fines levied by a court. If the vessel remains unclaimed, it will be disposed of in accordance with procedures set forth in Part III, Chapter 200, Hawaii Revised Statutes.

On the same day, Tyndzik posted a copy of the letter on vessel 7430. The letter to the post office box was returned unclaimed on January 22, 1994.

On January 6, 1994, a "Notice of Disposition of Derelict Vessels" concerning, *inter alia,* vessel 7430 was published in the Honolulu Star–Bulletin. The notice stated in relevant part:

> Any person entitled to any of these listed items may repossess and remove same, prior to January 27, 1994, upon payment of all towing, mooring fees, advertising and any other expenses incurred in connection with these items.... Pursuant to section 200–45, Hawaii Revised Statutes, the items listed are valued at less than $250.00 and will be disposed of as junk.

In a letter Brown wrote to Tyndzik while at sea, dated January 15, 1994, Brown demanded that Tyndzik "release to [him his] vessel as is, where is, [and] without any fees or charges due from [him]...." Brown acknowledged in the letter that "[Tyndzik] informed me on 12/29/93 that I would be charged ... to get my vessel back." Nevertheless, Brown threatened that, if vessel 7430

---

**3.** Brown testified at trial that, at the time of the impoundment, the gear aboard vessel 7430 was worth "at least $400," and the vessel itself was worth "about $500."

was not returned to him free of charge, he would pursue litigation. A handwritten note on the letter indicates that the letter was "hand delivered" on February 4, 1994.

Brown returned from sea on January 26, 1994, but did not go to the harbor office to reclaim vessel 7430 because he had "already written a letter" and was waiting for the harbor office to respond. Brown testified that when he went to examine vessel 7430 at the impound area on or about February 4, 1994, it had already been cut in half.

On February 9, 1994, DOBOR released vessel 7430 at no charge to King Kona Productions, Inc., to be used in the company's production of the film entitled "Waterworld." According to DOBOR, the accrued fees for the impoundment, mooring, and surveying of vessel 7430 amounted to $516.00.

### B. *Vessel 9362*

Brown also owned vessel 9362, a thirty-foot raft, for which DOBOR had issued a mooring permit for a mooring berth at "KT030" in the Ke'ehi Harbor offshore area, effective March 1, 1993 and expiring March 1, 1994. The mooring permit expressly provided that the permit could not be renewed "unless all fees and charges due and payable are paid." Brown continued to moor vessel 9362 at Ke'ehi Harbor after the permit's expiration date. Brown testified that he did not apply for a renewal of the permit because, in order to receive it, he would have been obliged to pay the monies levied pursuant to the impoundment of vessel 7430, and "[he] did not believe [he] owed [DOBOR] any money."

DOBOR sent Brown two letters regarding the lapse of the permit relating to vessel 9362. On May 21, 1994, DOBOR impounded vessel 9362 pursuant to HRS § 200–16 (1993)[4] and secured the vessel at the Kalihi channel impound area. On that same date, Tyndzik sent a letter by certified mail informing Brown both of the impoundment and of his right to request an administrative hearing.

On June 25, 1994, a marine surveyor reported to Thompson that he regarded the value of vessel 9362 as "none."[5] Vessel 9362

---

4. At the time of the impoundment, HRS § 200–16 provided in relevant part:

> **Mooring of unauthorized vessel in state small boat harbors and offshore mooring areas; impoundment and disposal proceedings.** (a) No person shall moor a vessel in a state small boat harbor or offshore mooring area without obtaining a use permit; nor shall a person continue to moor a vessel in any state small boat harbor or offshore mooring area if the use permit authorizing the vessel to moor has expired or otherwise been terminated.....
>
> (b) The department shall cause to be placed upon, or as near to the unauthorized vessel as possible, a notice to remove vessel, which shall indicate that the vessel is in violation of this section, the date and time the notice was posted, and that the vessel must be removed within seventy-two hours from the time the notice was posted.
>
> (c) An unauthorized vessel may be impounded by the department at the sole cost and risk of the owner of the vessel, if the vessel is not removed after the seventy-two-hour period or if during that period the vessel is removed and remoored in the harbor or mooring or anchorage area or any other state harbor or mooring or anchorage area without a use permit.
>
> (d) Custody of an unauthorized vessel shall be returned to the person entitled to possession upon payment to the department of all fees and costs due, and fines levied by the department or a court. In addition, the department, with-

in seventy-two hours of impoundment, shall send by certified mail, return receipt requested, a notice of impoundment to the registered owner or operator of the impounded vessel. *The owner or operator of the impounded vessel shall have ten days after receipt of notice of impoundment of the vessel to request in writing an administrative hearing.....*
(Emphasis added).

5. Brown objects to the admission of the valuation on the basis that it constitutes hearsay. HRS § 200–45 (1993) provides in relevant part that "public auction [of a vessel] shall not be required when the appraised value of any vessel is less than $250[.]" Brown has not challenged the propriety of DOBOR's decision to demolish vessel 9362 rather than to sell it at auction. Rather, he has challenged the propriety of DOBOR's initial decision to impound the vessel. Accordingly, the valuation of the boat was relevant only as *background* for the sequence of events in this case. In fact, the defendants stated, "[We] offer [the survey report] into evidence not for the truth of the matter asserted[,] but to show that the assessment was done and that based on the assessment received the department took action." The report was admissible to show the reasons for DOBOR's actions (*i.e.,* its decision to demolish the vessel) and not for the truth of the matter asserted (*i.e.,* that the vessel was worthless). As such, the report was not hearsay. *See* Hawai'i Rules of Evidence (HRE) Rule 801

was demolished on August 18, 1994. According to DOBOR, the accrued fees and costs for the impoundment, mooring, and surveying of vessel 9362 amounted to $1,586.00. This figure included $150.00 for "administrative impound fee[ ]s," $90.00 for "operational impound fee[ ]s," $1,296.00 for "mooring without permit fee[ ]s," $25.00 for "film development fees," and $25.00 for "survey."

### C. *Procedural History*

On December 28, 1995, Brown filed a complaint against the defendants seeking: (1) declaratory relief, injunctive relief, and damages for the violation of Brown's rights pursuant to the impoundment of vessel 7430; (2) general, special, and punitive damages,[6] pursuant to 42 U.S.C. § 1983 (1993);[7] and (3) general, special, and punitive damages against the defendants for negligence and emotional distress.[8] On June 10, 1996, the defendants filed an answer to the complaint; in addition, the State filed a counterclaim praying for an order that Brown pay the "fees, charges[,] and expenses," in an amount to be proven at trial, incurred in the mooring and impoundment of the two vessels. The case proceeded to a jury-waived trial on February 10, 1998.

Brown's position at trial, *inter alia*, was that the State did not have the authority to impound vessel 7430 because vessel 7430 was not a derelict pursuant to HRS § 200–48, *see supra* note 1. Brown contended that vessel 7430 was not derelict because (1) the vessel had not been "left unattended for a continu-

ous period of more than twenty-four hours" and (2) the vessel was not "in immediate danger of sinking," "obstructing a waterway," or "endangering life or property." Brown alleged that vessel 7430 was not "unattended" or "in immediate danger of sinking" because Thorp and Innis had been actively attempting to repair the vessel within the twenty-four hours prior to the impoundment. Furthermore, he testified that vessel 7430 was not moored in a "waterway," but in a "temporary anchorage area," and therefore could not possibly be "endangering life or property."

On March 19, 1998, the circuit court entered its findings of fact, conclusions of law, and order, which provided in relevant part that,

> ... [b]y the time of the impoundment on December 9, 1993, [vessel 7430] .... was sinking and was in danger of sinking completely, and was obstructing a waterway. Due to the vessel's diminishing visibility as it sunk further below the water's surface, it also endangered other vessels and their occupants.
>
> ....
>
> ... The evidence does not show that the Defendants unlawfully impounded and disposed of Brown's vessels.
>
> ....
>
> ... Defendants properly assessed mooring and impoundment fees for [vessel] 9362

(1993) (providing that " '[h]earsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence *to prove the truth of the matter asserted*" (emphasis added)); *cf. State v. Feliciano*, 2 Haw.App. 633, 638 P.2d 866 (1982).

6. It appears that Brown dismissed his claim for damages, pursuant to 42 U.S.C. § 1983, against the State and the individual defendants in their *official* capacities prior to trial, although we have been unable to locate any formal indication to that effect in the record on appeal, apart from the circuit court's finding of fact on the subject. Inasmuch as the circuit court's finding is uncontested, we presume it to be accurate.

7. 42 U.S.C. § 1983 provides in relevant part:

**Civil action for deprivation of rights.** Every person who, under color of any statute, ordi-

nance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

8. The circuit court found that, "[u]nder Brown's third claim for relief, he sought monetary damages against the State and the individual defendants in their official and independent capacities, based on four causes of action (*i.e.* negligence, abuse of process, conversion, and trespass)." The record on appeal indicates that Brown's complaint was not so specific. However, inasmuch as Brown's third claim for relief is not on appeal, and the circuit court's finding is uncontested, we need not disturb the finding.

in the amount of $1,586.00, which amount is awarded to the State of Hawai'i.

... The evidence is insufficient to sustain the claims asserted in the first and second claims for relief of Brown's complaint.

... The evidence is insufficient to sustain the claims asserted in the third claim for relief in Brown's complaint. The evidence does not show that defendants engaged in wrongful or unlawful conduct relating to Brown's vessels.

. . . .

... The evidence is insufficient to show Brown's entitlement to the relief sought in his complaint.

... The evidence is insufficient to show that defendants' conduct caused injury or damage to Brown.

Judgment was entered in the defendants' favor and against Brown on April 17, 1998. Brown was ordered to pay $372.00 for the impoundment and disposal of vessel 7430, and $1,586 for the impoundment and mooring of vessel 9362.

## II. *STANDARDS OF REVIEW*

### A. *Constitutional Law*

... We answer questions of constitutional law "by exercising our own independent judgment based on the facts of the case." *State v. Trainor,* 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (citations and internal quotation marks omitted); *State v. Lee,* 83 Hawai'i 267, 273, 925 P.2d 1091, 1097 (1996) (citation, internal quotation marks, and brackets omitted). Thus, we review questions of constitutional law under the "right/wrong" standard. *See State v. Toyomura,* 80 Hawai'i 8, 15, 904 P.2d 893, 900 (1995) (citing *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930 [*reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976] (1995), and *State v. Gaylord,* 78 Hawai'i 127, 137, 890 P.2d 1167, 1177 (1995)); *State v. Baranco,* 77 Hawai'i 351, 355, 884 P.2d 729, 733 (1994) (issue whether defendant's constitutional right against double jeopardy would be violated unless indictment dismissed is question of law, reviewed under right/ wrong standard); *In re [John] Doe, Born on January 5, 1976,* 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (whether speech is protected by first amendment to United States Constitution is applied to states through fourteenth amendment and by article I, section 4 of Hawai'i Constitution are questions freely reviewable on appeal). *State v. Quitog,* 85 Hawai'i 128, 139, 938 P.2d 559, 570 (1997) (quoting *State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)).

### B. *Findings Of Fact And Conclusions Of Law*

Findings of fact will not be disturbed unless clearly erroneous. *See Furukawa v. Honolulu Zoological Society,* 85 Hawai'i 7, 12, 936 P.2d 643, 648, *reconsideration denied,* 85 Hawai'i 196, 940 P.2d 403 (1997) (citation omitted). "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *State v. Kane,* 87 Hawai'i 71, 74, 951 P.2d 934, 937 (1998); *see also Britt v. United States Auto. Ass'n,* 86 Hawai'i 511, 516, 950 P.2d 695, 700 (1998).

*Kim v. Contractors License Bd.,* 88 Hawai'i 264, 269, 965 P.2d 806, 811 (1998).

We review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this ... standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 51, 53, 77 Hawai'i 51, 881 P.2d 538, 540 (1994) (citation omitted).

*State v. Medeiros,* 89 Hawai'i 361, 364, 973 P.2d 736, 739 (1999) (quoting *Kane,* 87 Hawai'i at 74, 951 P.2d at 937 (quoting *Aickin v. Ocean View Inv. Co.,* 84 Hawai'i 447, 453, 935

P.2d 992, 998 (1997))) (ellipsis points in original).

C. *Interpretation Of Statutes And Administrative Rules*

"[T]he interpretation of a statute ... is a question of law reviewable *de novo*." *State v. Arceo*, 84 Hawai'i [at] 10, 928 P.2d [at] 852 (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i [at] 18, 904 P.2d [at] 903; *State v. Higa*, 79 Hawai'i [at] 3, 897 P.2d [at] 930; *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997).

*State v. Dudoit*, 90 Hawai'i 262, 266, 978 P.2d 700, 704 (1999) (quoting *State v. Stocker*, 90 Hawai'i 85, 90, 976 P.2d 399, 404 (1999) (quoting *Ho v. Leftwich*, 88 Hawai'i 251, 256–57, 965 P.2d 793, 798–99 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan*, 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)))). "Additionally, the general principles of construction which apply to statutes also apply to administrative rules." *Keanini v. Akiba*, 84 Hawai'i 407, 412, 935 P.2d 122, 127 (App.), *cert. denied*, 85 Hawai'i 81, 937 P.2d 922 (1997) (citing *International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citations omitted)).

## III. DISCUSSION

A. *DOBOR's Failure To Accord Brown The Opportunity For A Hearing Regarding the Impoundment of Vessel 7430 Violated His Right To Procedural Due Process Pursuant To The United States And Hawai'i Constitutions.*

Brown contends that, "when protected property interests are to be taken, such as one's boat or live-aboard permit, a person is generally entitled to some kind of notice *and hearing* prior to its permanent deprivation." We agree. The fifth amendment to the United States Constitution provides in relevant part that "[n]o person shall ... be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use, without just compensation." Likewise, article I, section 5 of the Hawai'i Constitution provides in relevant part that "[n]o person shall be deprived of life, liberty, or property without due process of law...."

■ The requirement of procedural due process exists to protect individuals against the state's deprivation of liberty and property interests. *See In re Herrick*, 82 Hawai'i 329, 342, 922 P.2d 942, 956 (1996). We have repeatedly recognized that

[d]ue process is not a fixed concept requiring a specific procedural course in every situation. *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu*, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989); *cf. Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 [81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230] (1961). Rather, due process is flexible and calls for such procedural protections as the particular situation demands. *Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *Morrissey v. Brewer*, 408 U.S. 471, 481[, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484]... (1972). *The basic elements of procedural due process of law require* notice and *an opportunity to be heard at a meaningful time and in a meaningful manner. Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *see also Mathews v. Eldridge*, 424 U.S. 319, 333[, 96 S.Ct. 893, 902, 47 L.Ed.2d 18]... (1976); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 605–606 [95 S.Ct. 719, 721–722, 42 L.Ed.2d 751]... (1975).

*Evans v. Takao*, 74 Haw. 267, 282, 842 P.2d 255, 262 (1992). *See also Kernan v. Tanaka*, 75 Haw. 1, 22, 856 P.2d 1207, 1218 (1993).

*Price v. Zoning Bd. of Appeals,* 77 Hawai'i 168, 172, 883 P.2d 629, 633 (1994) (brackets and ellipses points in original). . . .

> Determination of the specific procedures required to satisfy due process requires a balancing of several factors: (1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail. *Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33; *Silver v. Castle Memorial Hosp.,* 53 Haw. [475,] 484, 497 P.2d [564,] 571 [ (1972) ].

*Sandy Beach Defense Fund,* 70 Haw. at 378, 773 P.2d at 261.

*Korean Buddhist Dae Won Sa Temple,* 87 Hawai'i at 243, 953 P.2d at 1341 (emphasis added) (some ellipsis points and brackets added and some in original).

 We agree with Brown's contention that he did not receive procedural due process with respect to the impoundment of vessel 7430. "Adequate notice under the Due Process Clause has two components. It must inform affected parties of the action about to be taken against them as well as of procedures available for challenging that action." *Atkins v. Parker,* 472 U.S. 115, 152, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985) (Brennan, J., dissenting) (citing *Memphis Light,*

*Gas & Water Div. v. Craft,* 436 U.S. 1, 13, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978)); *see also Herrick,* 82 Hawai'i at 343, 922 P.2d at 956. While the January 3, 1994 letter to Brown informed him of the impoundment and possible disposal of vessel 7430, the letter made no mention of "procedures available for challenging that action," administrative or otherwise.[9] Accordingly, Brown did not receive adequate notice regarding the impoundment of vessel 7430. Furthermore, Brown was never provided with an opportunity to be heard on the matter of vessel 7430's impoundment.[10]

At the outset,

> a claim of a due process right to a hearing requires a two[-]step analysis: (1) is the particular interest which the claimant seeks to protect by a hearing "property" within the meaning of the due process clauses of the federal and state constitutions, and (2) if the interest is "property" what specific procedures are required to protect it.

*Kernan* [*v. Tanaka* ], 75 Haw. [1,] 21, 856 P.2d [1207,] 1218 [ (1993) ] (quoting *Aguiar v. Hawaii Housing Auth.,* 55 Haw. 478, 495, 522 P.2d 1255, 1266 (1974)).

*Price,* 77 Hawai'i at 172, 883 P.2d at 633. In our view, the impoundment of vessel 7430 resulted in the deprivation of Brown's "property," including both the vessel itself and Brown's mooring and live-aboard permits. Vessel 7430 is, unquestionably, "property" pursuant to the fifth amendment to the Unit-

---

9. Brown's failure to request a hearing following his receipt of this inadequate notice cannot be deemed a waiver of his right to such a hearing. "[C]onstitutional rights may ordinarily be waived by clear and convincing evidence that the waiver is voluntary, knowing, and intelligent." *Davies v. Grossmont Union High Sch. Dist.,* 930 F.2d 1390, 1394 (9th Cir.), *cert. denied,* 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991) (addressing waiver of right to hold elected office); *see also Walters v. Reno,* 145 F.3d 1032, 1037 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999) (addressing waiver of right to a hearing in immigration document fraud proceedings); *cf. In re John Doe, Born on November 23, 1978,* 90 Hawai'i 246, 253, 978 P.2d 684, 691 (1999) (defendants may waive their right to be silent "provided the waiver is made voluntarily, knowingly, and intelligently" (citation and internal quotation signals omitted));

*State v. Richie,* 88 Hawai'i 19, 44, 960 P.2d 1227, 1252 (1998) (defendants may "knowingly, intelligently, and voluntarily" waive right to representation). No evidence was adduced at trial that Brown knew of his right to a hearing. Inasmuch as Brown may not have *known* that he had a right to an administrative hearing in the present case, he cannot constitutionally have waived such a right.

10. At the time that vessel 7430 was impounded, neither HRS § 200–49 nor the departmental regulations promulgated for small boat harbors, *see* Hawai'i Administrative Rules (HAR) Title 19, Subtitle 3, Part 3, Chapters 61 through 66 (1992), made any mention of a right to a hearing prior to the disposal of a derelict vessel incident to its impoundment. *But cf.* HRS § 200–16(d), *supra* note 4.

ed States Constitution and article I, section 5 of the Hawaiʻi Constitution. The mooring and live-aboard permits should likewise be considered property for due process purposes.

This conclusion follows inexorably from a solid line of recent cases rejecting the traditional "right-privilege" distinction in this area of the law and holding that a benefit which one is entitled to receive by statute constitutes a constitutionally-protected property interest. *See, e.g., Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (welfare benefits); *Escalera v. New York City Housing Authority,* [425 F.2d 853,] 861 [(2d Cir.1970)] (tenancy in public housing); *Mortensen v. Board of Trustees,* 52 Haw. 212, 473 P.2d 866 (1970) (disability retirement benefits). *Aguiar,* 55 Haw. at 496, 522 P.2d at 1267; *see also Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430–433, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (holding that adjudicatory procedures may, in certain circumstances, constitute a property right); *Kernan,* 75 Haw. at 21–22, 856 P.2d at 1218 (holding that driver's licenses constitute "property"). Inasmuch as the "benefit" of obtaining permits for state small boat harbors is granted by statute, *see* HRS § 200–10 (1993),[11] a mooring or live-aboard permit constitutes a constitutionally protected property interest. In other words, Brown had a "legitimate claim of entitlement" to his permits. *See Sandy Beach Defense Fund,* 70 Haw. at 377, 773 P.2d at 260.

■ Because Brown's property interests are implicated, we examine the case in light of the three-part *Sandy Beach Defense Fund/Mathews* test. First, we note that the private interest at stake in this case is significant. Vessel 7430 was not simply a vehicle for pleasure or transportation; Brown held a live-aboard permit in connection with it. In some respects, Brown's rights to use his vessel as he saw fit were restricted by DOBOR regulations.[12] Nevertheless, an individual's "right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance." *United States v. James Daniel Good Real Property,* 510 U.S. 43, 53–54, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). The private interests at stake in the impoundment of a boat that may also serve as a home carry significant weight in conducting the *Sandy Beach Defense Fund /Mathews* balance.

■ Likewise, the risk created by erroneous deprivation of property through *ex parte* impoundment cannot be ignored. Pursuant to HRS § 200–48, in issuing a notice of impoundment for a derelict vessel, the chairperson need determine only (1) that the vessel has been left unattended for twenty-four hours or more and (2) that the vessel "is sunk or in immediate danger of sinking, is obstructing a waterway, or is endangering life or property." The government is not required to adduce any evidence regarding the basis of its determination, nor is it required to examine any potential defenses the owner might have. *See James Daniel Good Real Property,* 510 U.S. at 55, 114 S.Ct. 492 (noting that an "*ex parte* preseizure proceeding affords little or no protection to the innocent owner"). Thus, the owner has no forum in which to contest DOBOR's conclusions prior to the seizure.

■ With regard to the final *Sandy Beach Defense Fund /Mathews* factor, the government doubtlessly has a great interest in keeping state waters open for public use. The legislature has noted that "[d]erelict vessels are not only dangerous to navigation, but are unsightly and occupy space urgently needed for other vessels['] use for recreation and commercial purposes." Hse. Stand. Comm. Rep. No. 755–72, in 1972 House Journal, at 1019. Thus, the public interest lies in keeping waterways clear and safe. Derelict vessels pose an immediate threat to the pub-

11. HRS § 200–10 provides in relevant part:
 **Permits and fees for state small boat harbors.** (a) No person shall moor a vessel in a state small boat harbor without:
 (1) First obtaining a use permit from the department. . . .

12. For example, the record reflects that Brown agreed to notify the state and request a revision of his live-aboard permit if additional individuals intended to reside aboard vessel 7430; Brown also agreed to maintain the vessel "in good material and operating condition[.]"

lic interest, however, only when they lie *in the public waterways.* On the other hand, while the government may have an interest in the speedy disposition of such vessels, *see* Sen. Stand. Comm. Rep. No. 859–70, in 1970 Senate Journal, at 1387 (noting that a statutory precursor to HRS § 200–48 would have "provide[d] the procedure for disposition of abandoned vessels in a more expeditious manner"), the interest in speed diminishes significantly after impoundment. What may have constituted an emergency at the time the vessel was sinking in state waters simply becomes a matter of temporary storage once the vessel has been impounded.

■ Moreover, there is no reason to believe that providing the owners of derelict vessels with hearings following impoundment would result in significant "fiscal or administrative burdens" to the state. *Herrick,* 82 Hawai'i at 343, 922 P.2d at 956; *see also Mathews,* 424 U.S. at 335, 96 S.Ct. 893. DOBOR already has the benefit of a statutorily mandated mechanism for providing administrative hearings subsequent to the impoundment of vessels that are moored without authorization in state waters. *See* HRS § 200–16(d), *supra* note 4. Contests over the impoundment of abandoned and derelict vessels could be heard in the same forum. We recognize that DOBOR might temporarily incur the cost of storing impounded vessels, but such costs could be recouped in the event the impoundments were found to be valid following a hearing on the matter. *See Price,* 77 Hawai'i at 175, 883 P.2d at 636 (noting that "penalties which accrue during the period in which liability is contested 'are common.... They are valid, assuming the [appellant] is accorded adequate opportunity to challenge their assessment at the administrative level before payment must begin.' " (Citations omitted.) (Brackets in original.)).

Accordingly, the additional safeguard of a hearing would not significantly increase the burden on the state.[13]

The present case is analogous to *Nolt v. Isadore,* 590 F.Supp. 518 (D.Alaska 1984). In *Nolt,* the owner of an allegedly abandoned vessel complained that the City of Juneau's impoundment of his vessel without a hearing deprived him of property without due process of law. *Id.* at 521. The federal district court observed that "the ordinance in question here provided no opportunity for the owner of an impounded boat to obtain its release by posting bond and establishes no procedure to assure reliability of the determination that impoundment was justified." *Id.* at 522. After weighing individual and state interests, the district court concluded that the private interests involved outweighed the single government interest at stake, *i.e.,* the avoidance of "the inconvenience and expense of a prompt hearing[.]" *Id.* at 523. The district court held that the statute regarding the impoundment of vessels "is constitutionally defective in that there is no provision for a meaningful hearing even after seizure." *Id.* at 522.

■ We likewise hold that a vessel and its accompanying mooring and live-aboard permits are constitutionally protected "property," of which an individual may not be deprived without notice and an opportunity to be heard. Application of the *Sandy Beach Defense Fund/Mathews* balancing test dictates that the state must provide a hearing to owners of derelict vessels as soon as reasonably possible following a vessel's impoundment. That being so, we hold that vessel 7430 [14] was destroyed and that fees were assessed against Brown without adequate

---

**13.** This is not to say that DOBOR was required to afford Brown a hearing *prior* to the impoundment of vessel 7430. "[S]ummary administrative action may be justified in *emergency situations.*" *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 300, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (emphasis added). "Where extraordinary circumstances justify dispensing with a pre-deprivation hearing, however, a *prompt* post-deprivation hearing must be provided." *G & G Fire Sprinklers, Inc. v. Bradshaw,* 156 F.3d 893, 903 (9th Cir.1998) (emphasis added); *see also Federal Deposit Ins. Corp. v. Mallen,* 486 U.S. 230, 246, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988).

**14.** Inasmuch as Brown was provided with an opportunity to be heard regarding the impoundment of vessel 9352, *see supra* note 4, we cannot hold that Brown's due process rights were violated with respect to vessel 9352.

procedural due process, and that Brown is entitled to a declaration to this effect.[15]

#### B. The Impoundment Of Vessel 7430 Did Not Constitute An Unconstitutional Taking.

 Brown alleges that, in addition to violating his right to procedural due process, the impoundment of vessel 7430 represented "an unlawful taking without just compensation." Brown's argument is unfounded. While the underpinnings of the "takings" clause are of unquestionable value, "the lawful exercise of the police power may incidentally result in the taking or destroying of private property without any compensation being made to the owner." *Brown v. Campbell,* 21 Haw. 314, 323 (1912).

> Long ago[,] it was recognized that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community," *Mugler v. Kansas,* 123 U.S. [623], 665, 8 S.Ct. 273, 31 L.Ed. 205 [ (1887) ]; see also *Beer Co. v. Massachusetts,* 97 U.S. 25, 32, 24 L.Ed. 989 (1878), and the Takings Clause did not transform that principle to one that requires compensation whenever the State asserts its power to enforce it. See *Mugler,* 123 U.S. at 664, 8 S.Ct. 273.

*Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 491–492, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987); see also *Miller v. Schoene,* 276 U.S. 272, 279–280, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (noting that "where the public interest is involved[,] preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property"). Furthermore, a long line of cases sustains

> against Due Process and Takings Clause challenges the State's use of its "police powers" to enjoin a property owner from activities akin to public nuisances. See *Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (law prohibiting manufacture of alcoholic beverages); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (law barring operation of brick mill in residential area); *Miller v. Schoene,* 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (order to destroy diseased cedar trees to prevent infection of nearby orchards); *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (law effectively preventing continued operation of quarry in residential area).

*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1022, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

 The trial court found that vessel 7430 "was sinking and was in danger of sinking completely, and was obstructing a waterway." [16] Vessel 7430 presented, therefore, an emergency situation potentially injurious to the public welfare. The state has a duty to protect the public interest by keeping public waterways clear of potentially dangerous objects. Inasmuch as the impoundment of vessel 7430 was undertaken in substantial advancement of legitimate state interests, *see Lucas,* 505 U.S. at 1022–1024, 112 S.Ct. 2886, the impoundment cannot be considered a violation of the takings clause. Accordingly, Brown is not entitled to compensation on that basis.

#### C. Brown Is Not Entitled To Nominal Damages Against Thompson Or Tyndzik With Respect To The Violation Of Brown's Right To Procedural Due Process.

 As a final due process matter, Brown asserts that he is entitled to damages pursuant to 42 U.S.C. § 1983. A two-step

---

**15.** However, we note that it would be impossible to grant Brown's prayer for injunctive relief, pursuant to 42 U.S.C. § 1983, that his live-aboard permit for vessel 7430 be reinstated, because vessel 7430 has been demolished and the live-aboard permit was particular to vessel 7430.

**16.** While Brown disputes that the location at which vessel 7430 was moored should be characterized as a "waterway," in light of the evidence adduced at trial on the issue, we hold that this finding of fact was not clearly erroneous. Testimony was adduced at trial by two individuals that the area in which vessel 7430 was moored was a "navigable waterway ... heavily used" and traversed "on a daily basis."

process is applied to the determination whether section 1983 is available to remedy a constitutional violation:

First, the plaintiff must assert the violation of a federal right. . . . In deciding whether a federal right has been violated, we have considered whether the provision in question creates obligations binding on the governmental unit or rather does no more than express a congressional preference for certain kinds of treatment. The interest the plaintiff asserts must not be too vague and amorphous to be beyond the competence of the judiciary to enforce. We have also asked whether the provision in question was intended to benefit the putative plaintiff.

Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress specifically foreclosed a remedy under § 1983, by providing a comprehensive enforcement mechanism for protection of a federal right[.] The availability of administrative mechanisms to protect the plaintiffs' interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy. Rather the statutory framework must be such that allowing a plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme. The burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant. We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.

*Aged Hawaiians v. Hawaiian Homes Comm'n,* 78 Hawai'i 192, 206, 891 P.2d 279, 293, *cert. denied,* 516 U.S. 819, 116 S.Ct. 77, 133 L.Ed.2d 36 (1995) (citing *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106–07, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (internal quotations and citations omitted)) (brackets and ellipsis points in original). With regard to the first step, Brown has successfully demonstrated that his federal constitutional right to procedural due process was violated. *See supra* section III.A. With regard to the second step, the defendants have adduced no evidence that Congress intended to foreclose a section 1983 claim under the present circumstances.

Therefore, Brown has established a valid basis for his section 1983 claim.

■ Brown raises his section 1983 claim against the individual defendants in their individual capacities. "Federal law dictates the characterization of claims brought under § 1983." *Pele Defense Fund v. Paty,* 73 Haw. 578, 595, 837 P.2d 1247, 1259 (1992), *cert. denied,* 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993). In section 1983 claims raised against public officials in their individual capacities, the officials may assert qualified immunity and thereby be "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see also Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 535 (8th Cir.1999). The United States Supreme Court has recently clarified the "clearly established" requirement as follows:

What this means in practice is that "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citing *Harlow, supra,* at 819, 102 S.Ct. 2727); *see also Graham v. Connor,* 490 U.S. [386,] 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 [ (1989) ].

In *Anderson,* we explained that what "clearly established" means in this context depends largely "upon the level of generality at which the relevant 'legal rule' is to be established." 483 U.S., at 639, 107 S.Ct. 3034. "Clearly established" for purposes of qualified immunity means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing

law the unlawfulness must be apparent." *Id.,* at 640, 107 S.Ct. 3034 (internal citations omitted); *see also United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

*Wilson v. Layne,* 526 U.S. 603, ——, 119 S.Ct. 1692, 1699, 143 L.Ed.2d 818 (1999).

> [T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.

*Anderson,* 483 U.S. at 639, 107 S.Ct. 3034. Therefore, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson,* 526 U.S. at ——, 119 S.Ct. at 1700. Accordingly, in this case, the question is whether reasonable officers in Thompson and Tyndzik's positions could have believed that disposing of a vessel, impounded for being derelict, was lawful in light of clearly established law and the information Thompson and Tyndzik possessed. *Cf. id.*

▪ We hold that it was not unreasonable for Thompson and Tyndzik to have believed that it was lawful to dispose of vessel 7430 without offering Brown a hearing. First, the law regarding the right to a hearing subsequent to the impoundment of a derelict vessel was not clearly established at the time of Thompson's and Tyndzik's actions. "[B]ecause procedural due process analysis essentially boils down to an ad hoc balancing inquiry, the law regarding proce-

dural due process claims 'can rarely be considered "clearly established" at least in the absence of closely corresponding factual and legal precedent.' " *Brewster v. Board of Education of the Lynwood Unified School District,* 149 F.3d 971, 983 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999) (quoting *Baker v. Racansky,* 887 F.2d 183, 187 (9th Cir.1989) (quoting *Myers v. Morris,* 810 F.2d 1437, 1462 (8th Cir.1987))); *see also Anderson,* 483 U.S. at 656 n. 12, 107 S.Ct. 3034 ("an official's conduct is not susceptible to a determination that it violated clearly established law because it is regulated by an extremely general and deeply entrenched norm, such as the command of due process.... The *principle* is clearly established, but whether it would brand the ... conduct illegal often cannot be ascertained without reference to facts that may be in dispute." (Emphasis added.)). Brown has failed to point to *any* cases presenting "closely corresponding factual and legal precedent" in either state or federal law.[17] Furthermore, the Hawai'i statutes regarding derelict vessels, HRS §§ 200–48, *see supra* note 1, and 200–49, *see supra* note 2, are silent regarding the right to a hearing, and this court is unaware of any potentially applicable federal statutes.

Second, Thompson and Tyndzik possessed no information that indicated that Brown had a right to a hearing. As observed above, the only authority available to Thompson and Tyndzik regarding the disposition of derelict vessels—the provisions of HRS § 200–49— was silent as to the right of the owner of an impounded vessel to a hearing. Had there been a clearly established body of case law regarding the right to a hearing upon the impoundment of an allegedly derelict vessel, the statute's silence on the subject could not have rendered reasonable any belief by Thompson and Tyndzik to the contrary. *See Wilson,* 526 U.S. at ——, 119 S.Ct. at 1701 (observing that the existence of a policy or past practice "could not make reasonable a belief that was contrary to a decided body of

---

**17.** The one case that this court has found on point, *Nolt, supra,* cannot be considered sufficient to have clearly established the law in this situation. While factually analogous, one federal district court's opinion construing an ordinance

of the City of Juneau does not, in and of itself, "clearly establish" that the impoundment of vessels without a hearing in Hawai'i violates an individual's right to due process.

case law"). But in the present matter, the law regarding post-impoundment hearings was not clearly established, and it was therefore not unreasonable for Thompson and Tyndzik to look to and rely upon the express terms of HRS § 200–49.

Although Thompson and Tyndzik erred in failing to provide Brown with a hearing regarding the impoundment of vessel 7430, they are nevertheless entitled to qualified immunity because their conduct was *reasonable*.

> The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley* [*v. Briggs* ], 475 U.S. [335], 343 [106 S.Ct. 1092, 89 L.Ed.2d 271] [ (1986) ]. This accommodation for reasonable error exists because "officials should not err always on the side of caution" because they fear being sued. *Davis* [*v. Scherer* ], 468 U.S. [183], 196 [104 S.Ct. 3012, 82 L.Ed.2d 139] [ (1984) ].

*Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). Thompson and Tyndzik "cannot have been 'expected to predict the future course of constitutional law.' " *Wilson,* 526 U.S. at ——, 119 S.Ct. at 1701 (citing *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)). Accordingly, we hold that Thompson and

Tyndzik, in their individual capacities, did not violate Brown's right to due process.

D. *The State Has Failed To State A Claim Upon Which Relief Can Be Granted Regarding The Assessment Of Fees Both For The Impoundment And Disposal Of Vessel 7430 And For Brown's Unauthorized Mooring Of Vessel 9362.*

Brown argues that DOBOR did not have the statutory authority to charge a fee either for the impoundment and disposal of vessel 7430 or for Brown's unauthorized mooring of vessel 9362. We agree.

1. *DOBOR lacked the statutory authority to assess fees against Brown for the impoundment and disposal of vessel 7430.*

The State argues that fees and costs were properly assessed against Brown for the impoundment and disposal of vessel 7430 pursuant to HRS § 200–44 (1993).[18] Specifically, the state contends that HRS §§ 200–44 and 200–49 are "complementary," and therefore, that the expenses enumerated in HRS § 200–44 should be assessed against derelict vessels such as Brown's. In effect, the State is suggesting that the statutory provisions regarding *abandoned* vessels—HRS §§ 200–41 (1993),[19] 200–42 (1993),[20] 200–43 (1993),[21] 200–44, 200–45 (1993),[22] 200–46 (1993),[23] and

---

**18.** HRS § 200–44 provides in relevant part:

> **Possession by interested party.** Any person having an interest in the vessel may take possession of the vessel prior to the date of public auction *upon payment to the department of all use fees, towing, handling and storage charges, appraisal and advertising expenses, and any other expenses* incurred by the department in connection with the vessel.

(Emphasis added.)

**19.** HRS § 200–41 provides:

> **Disposition by chairperson of certain abandoned vessels.** Any vessel which:
> (1) Has been left unattended for a continuous period of more than thirty days; and
> (2) Is within the waters of the State or on public property, or is on private property without authorization of the owner or occupant of the property,
> may be caused by the chairperson to be taken into custody and disposed of pursuant to this part.

**20.** HRS § 200–42 provides in relevant part: "Upon taking custody of any such vessel, a written notice shall be immediately posted on the vessel and a duplicate original thereof sent . . . to the registered owner of the vessel[.]"

**21.** HRS § 200–43 provides in relevant part: "If the vessel is not repossessed within twenty days after the mailing of the notice, the vessel shall be disposed of by public auction[.]"

**22.** HRS § 200–45 provides in relevant part: "Public auction shall not be required when the appraised value of any vessel is less than $250. . . . Upon that determination the chairperson may sell the vessel by negotiation, dispose of it as junk, or donate the vessel to any governmental agency."

**23.** HRS § 200–46 provides in relevant part: "The transfer of interest by sale hereunder shall be evidenced by a bill of sale from the department, shall be considered a transfer by operation of law, and shall be governed by provisions applicable thereto."

200–47 (1993)[24]—must be read *in pari materia* with provisions regarding *derelict* vessels—HRS §§ 200–48, *see supra* note 1, and 200–49, *see supra* note 2. " '[L]aws *in pari materia*, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another.' HRS § 1–16 (1993)." *Jenkins v. Liberty Newspapers Ltd. Partnership*, 89 Hawai'i 254, 263, 971 P.2d 1089, 1098 (1999) (quoting *Ho v. Leftwich*, 88 Hawai'i at 257, 965 P.2d at 796 (quoting *Korean Buddhist*, 87 Hawai'i at 229–30, 953 P.2d at 1327–28)).

HRS §§ 200–48 and 200–49 had their genesis in the 1972 legislative session, at which point they were *added* to already-existing provisions regarding abandoned vessels. *See* 1972 Haw. Sess. L. Act 28, at 195–96. The legislature enacted HRS §§ 200–48 and 200–49 to provide for "the disposition of derelict vessels as distinguished from abandoned vessels[.]" Sen. Stand. Comm. Rep. No. 387–72, in 1972 Senate Journal, at 912–13 (emphasis added). The legislative history, therefore, establishes that the legislature recognized a difference between abandoned and derelict vessels. However, the legislature also inserted the provisions regarding derelict vessels into a comprehensive statutory scheme that expressly outlined the procedure for disposing of abandoned vessels.

HRS § 200–49 pertains to the disposition of derelict vessels. It specifies the consequences for a vessel that is not "repossessed within twenty days," in language that precisely mirrors the language regarding the repossession of abandoned vessels in HRS § 200–43. Moreover, HRS § 200–49 provides that a derelict vessel that is not repossessed may be disposed of by negotiated sale, public auction, or destruction. The consequences outlined in HRS § 200–49 are

the same, therefore, as those provided for abandoned vessels in HRS §§ 200–43, *see supra* note 21, and 200–45, *see supra* note 22. Inasmuch as the legislature appended the provisions relating to derelict vessels to the general statutory scheme regarding the disposition of abandoned vessels, and the language regarding the disposition of derelict vessels exactly tracks that regarding abandoned vessels, we agree with the State that the statutory provisions governing the disposition of abandoned vessels also apply to derelict vessels.

A reading of the statutory provisions pertaining to abandoned and derelict vessels *in pari materia* does not lead, however, to the result suggested by the State. By the State's own admission, vessel 7430 was derelict. Pursuant to HRS § 200–49, an individual may "repossess[ ]" a derelict vessel. The use of the term "repossess" refers back to HRS § 200–44, which allows DOBOR to recover costs attendant to impounding vessels by requiring that an individual, in order to repossess a vessel, must pay "all use fees, towing, handling and storage charges, appraisal and advertising expenses, and any other expenses incurred by the department in connection with the vessel." Alternatively, pursuant to HRS § 200–49, DOBOR may attempt to recoup its expenses "by negotiated sale, except that, when two or more purchasers indicate an interest in purchasing the vessel, the vessel will be sold at public auction to the highest bidder."[25] In sum, DOBOR may not recover expenses incurred in the impoundment of a derelict vessel unless the vessel has been (1) repossessed or (2) sold by negotiated sale or at auction.

Nowhere, however, does the statutory scheme accord the State the right to initiate litigation for the recovery of fees and costs outside of the two modes of relief expressed

---

**24.** HRS § 200–47 provides in relevant part:

**Disposition of proceeds.** The department shall deposit that portion of the proceeds of the sale of a vessel as shall represent the mooring or other fees and charges due the department, the expenses of the auction, and any other expense incurred by the department in taking into custody and disposing of an abandoned vessel, into the boating special fund from which the expenses incurred in connection

with the abandoned vessel, were paid. The balance, if any, shall be deposited into the general fund of the State.

**25.** These consequences are the same as those prescribed by HRS §§ 200–43 and 200–45. We note that, should DOBOR sell a vessel for less than the expense of its impoundment, the statute does not confer a right upon the State to sue the vessel's owner for the deficiency or arrearage.

in the statute: repossession or sale. In other words, the statute does not authorize a claim for fees and costs attendant to non-repossessed vessels. In the present matter, Brown did not repossess vessel 7430, and, accordingly, HRS § 200–44 does not afford the State any relief. Furthermore, DOBOR *did* engage in a negotiated sale of vessel 7430; it sold the vessel to King Kona Productions for a purchase price of $0.00. Under these circumstances, DOBOR has no statutory basis upon which to charge fees for the impoundment and disposal of vessel 7430.

2. *DOBOR lacked the statutory authority to charge Brown mooring fees for Brown's unauthorized mooring of vessel 9362.*

■ The State argues that fees may be charged for Brown's unauthorized mooring of vessel 9362, pursuant to HRS § 200–16, *see supra* note 4.[26] Again, the defendants appear to have misread the relevant statute. HRS § 200–16(c) provides that the "cost" of *impounding* a vessel may be charged to its owner; HRS § 200–16(d) provides in relevant part that "all fees and costs due, and fines levied by [DOBOR]" will be charged where a person *repossesses* an impounded vessel. HRS § 200–16 is not, however, a rent collection mechanism for fees incurred *prior* to a non-repossessed vessel's impoundment—in other words, it does not provide for a blanket assessment of mooring fees for all unauthorized vessels. Inasmuch as Brown did not repossess vessel 9362, there is no statutory mechanism for recouping fees assessed against Brown for the unauthorized mooring of vessel 9362.

E. *DOBOR Correctly Assessed Fees Against Brown For The Impoundment Of Vessel 9362.*

■ Brown argues that "the ability to charge anything DOBOR deems 'appropriate'

for the impounding of 9362 … is arbitrary[.]" Brown's argument is untenable. HRS § 200–16(c), *see supra* note 4, provides that "[a]n unauthorized vessel may be impounded by the department *at the sole cost and risk of the owner of the vessel* [.]" (Emphasis added). This court recognizes

> a well established rule of statutory construction that, where an administrative agency is charged with the responsibility of carrying out the mandate of a statute which contains words of broad and indefinite meaning, courts accord persuasive weight to administrative construction and follow the same, unless the construction is palpably erroneous.

*Keliipuleole v. Wilson,* 85 Hawai'i 217, 226, 941 P.2d 300, 309 (1997) (quoting *Treloar v. Swinerton & Walberg Co.,* 65 Haw. 415, 424, 653 P.2d 420, 426 (1982)). Accordingly, we give persuasive weight to DOBOR's charge of $150 for administrative impound fees and $90 for operational impound fees. Brown has adduced no evidence to suggest that these charges were arbitrary or unfounded. We therefore hold that the impoundment fees set by DOBOR were not unlawful.

The correct calculation of fees against Brown with respect to vessel 9362 would have been $90.00 for operational impound fees, $150.00 for administrative impound fees, $25.00 for film development,[27] and $25.00 for the survey of the vessel—for a total of $290.00. DOBOR should, therefore, have assessed $290.00 against Brown for the impoundment of vessel 9362.

IV. *CONCLUSION*

Based on the foregoing analysis, we vacate the circuit court's judgment and remand this matter for the entry of a judgment: (1) in favor of Brown and against the defendants, (a) granting Brown's prayer for a declaration that his right to procedural due process was violated with respect to the impoundment

---

26. The State also relies on Hawai'i Rules of Administrative Procedure (HAR) §§ 13–321–10 (1994) and 13–234–5(e). Neither of these rules supports the State's argument. HAR § 13–321–10 merely provides that: (1) costs shall be paid when a person wishes to repossess a vessel; and (2) if costs are not paid, DOBOR may sell the vessel. HAR § 13–321–5(e) sets a rate schedule

of mooring fees for vessels occupying moorings without permission, but it does not provide that these fees must be paid after a vessel has been impounded.

27. Brown does not contest the film development and surveying fees assessed against him.

and disposal of vessel 7430, and (b) denying the defendants' counterclaim for the amounts assessed for the impoundment and disposal of vessel 7430; and (2) in favor of the defendants and against Brown, (a) granting the defendants' counterclaim in the amount of $290.00, to be assessed against Brown for the impoundment of vessel 9362, and (b) denying Brown's claims for injunctive relief and damages.