22 P.3d 86

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Armand M. PESENTHEINER, Defendant–Appellant.**

**No. 22605.**

Intermediate Court of Appeals of Hawai'i.

March 5, 2001.

Certiorari Denied May 4, 2001.

Shirley M. Kawamura, Deputy Public Defender, on the briefs, for defendant-appellant.

Mangmang Qiu Brown, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

Following a bench trial in the district court of the first circuit, Defendant–Appellant Armand Pesentheiner was convicted of harassment, in violation of Hawai'i Revised Statutes (HRS) § 711–1106(1)(a), and sentenced to pay a $100 fine. The fine was deducted from bail returned to him.

HRS § 711–1106(1)(a) (Supp.2000) provides that "[a] person commits the offense of harassment if, with intent to harass, annoy, or alarm any other person, that person . . . [s]trikes, shoves, kicks, or otherwise touches another person in an offensive manner or subjects the other person to offensive physical contact[.]"

On appeal, Pesentheiner first argues that the district court erred in finding him guilty because there was insufficient evidence to establish that, in knocking a police officer's hat off, he "touch[ed] another person in an offensive manner or subject[ed] the other person to offensive physical contact[,]" as required for conviction under HRS § 711–1106(1)(a).

Pesentheiner also contends there was insufficient evidence to establish that he acted with the "intent to harass, annoy, or alarm" the police officer. With respect to this issue,

Pesentheiner makes two contentions: (1) that his conduct was accidental, and (2) that the district court found his actions to be merely "reckless." Both contentions are at odds with the statute's express requirement that an intentional state of mind be proved. Agreeing with the latter contention, we vacate the judgment of the district court and remand the case for retrial.

## I. Background.

On February 7, 1999, Pesentheiner was a spectator at the "Pro Bowl," a post-season professional football game held at Aloha Stadium featuring stellar National Football League players. Pesentheiner arrived at the stadium parking lot between 9 a.m. and 10 a.m., where he mingled with other fans and consumed about five or six beers before entering the stadium at noon to view the game. Pesentheiner testified that because "[i]t was a hot sunny day" and he "hadn't eaten breakfast[,]" he was "a little intoxicated[.]"

At about 2 p.m., near the end of the first quarter of play, Pesentheiner hopped a fence and made his way onto the playing field, ostensibly to obtain an autograph. Pesentheiner walked on the sideline to about the twenty-yard marker at the south end of the stadium before being spotted by security personnel.

Officer Kyle Takahashi, a uniformed Honolulu police officer, was the first to confront Pesentheiner. He noticed that Pesentheiner was holding "a plastic cup with yellowish liquid," which he assumed was beer. Pesentheiner grew disgruntled when Officer Takahashi denied his request to "go jump back up and . . . go back to my seat" and instead told him that he had "to leave the premises of the stadium and that's the rules of the stadium[.]"

Officer Takahashi testified that he positioned himself to Pesentheiner's right, placing one hand on Pesentheiner's right arm and the other against Pesentheiner's lower back. He then attempted to escort Pesentheiner from the stadium via the south end zone exit. As they approached the end zone, Pesentheiner started yelling, raising his hands and waving at the crowd. As Pesen-

theiner himself described it, he was "hamming it up" in an effort to "steal the show."

At that point there was a break in the game, and Officer Takahashi noticed that the crowd's attention had focused upon them. Pesentheiner's gesticulations had noticeably excited the spectators. Seeing that Pesentheiner was agitating the crowd, and fearing for the welfare of the officers patrolling the stands, Officer Takahashi pulled Pesentheiner towards the exit with greater force, telling him, "let's go." This apparently angered Pesentheiner. As Officer Takahashi described it, Pesentheiner then took his attention away from the crowd, "turned towards me[,]" took "a small step towards me[,]" and "with his left hand, he swung at my head area hitting my hat off." The hat landed five to ten feet away.

On cross-examination, Officer Takahashi conceded that he was unsure if Pesentheiner ever made eye contact with him. He also acknowledged that Pesentheiner did not say anything when he turned and swung.

In his defense, Pesentheiner testified that his contact with Officer Takahashi's hat was accidental and not intentional. He claimed that he was "basically waving [at] the crowd looking around the stadium all excited and, basically, my hand must have brushed the hat or, basically, tipped it and that was history." Then, he testified, "I felt a knee in my back, my face had hit the ground and that's basically what had happened. They pulled me up and then walked me out."

Jay Kent Bien, a coworker of Pesentheiner's for about two or three years but not a friend, testified that Pesentheiner's contact with the police officer's hat was "obviously not an intentional action." The State objected to this testimony and the district court, sustaining, struck the remark. Bien's attention had been directed to the incident by "a little bit of a swell of a noise from the crowd[.]" He saw Pesentheiner raising his hand and playing to the crowd as he was being escorted off the field. Then, Bien testified, "he hits one of the officer's [sic] hats and it goes tumbling off." Bien made these observations through his binoculars while sitting in the uppermost stands near the south end zone. He could not supply other details, such as the positions of the police officers relative to Pesentheiner, whether Officer Takahashi was one of the officers who confronted Pesentheiner, and whether the officers attempted to physically restrain Pesentheiner when he began inciting the crowd.

In any event, Officer Takahashi responded to the loss of his hat by tackling Pesentheiner and handcuffing him with the help of other police officers. One of the officers, Neville Colburn, testified that Pesentheiner "had a strong odor of an alcoholic beverage emitting from his breath," and that "his speech seemed somewhat slurred." Both Officer Takahashi and Officer Colburn remembered that Pesentheiner became extremely unruly after being handcuffed, yelling "[y]ou fucking japs hate haoles" and "fucking haole cop" while being led to Officer Colburn's police car.

In closing, the State argued that Officer Takahashi's testimony was credible and proved that Pesentheiner's contact with his hat was clearly intended to harass, annoy or alarm him. The State also attacked the credibility of Pesentheiner and Bien, arguing that inconsistencies in their testimonies, coupled with Pesentheiner's admitted intoxication, failed to raise a reasonable doubt as to Pesentheiner's intent.

In his closing argument, Pesentheiner pointed to his testimony and Bien's testimony, both of which characterized his contact with Officer Takahashi's hat as accidental. He argued that this created a reasonable doubt that he possessed the state of mind necessary for conviction.

In ruling on Pesentheiner's case, the district court announced that it had "a few findings to pass along." The court first found that Pesentheiner's contact with Officer Takahashi's hat constituted "an offense of [sic] touching as the harassment provision requires." The court reasoned that the dispositive issue thereupon became "whether it's accidental or intentional[.]"

In ascertaining Pesentheiner's state of mind, the court initially looked at "the circumstances [in] which the defendant places himself." The court observed that Pesentheiner had consumed enough alcohol "to

cause him to go over into the field and put himself in a position where he has to be taken custodial-wise off the field[.]" The court also noted that Pesentheiner "elects to showboat to the crowd and starts waving his arms, or one of his arms[,]" while being escorted off.

The court surmised that "when you elect to wave your hands when you're being escorted off, you're as reckless as you would be in an assault case, and as far as this Court's concerned, intentional, whether it's specific intent or just general intent." Having concluded that Pesentheiner possessed the requisite state of mind, the court found him guilty as charged.

## II. Standards of Review.

### A. Sufficiency of the Evidence.

In considering whether evidence adduced at trial is sufficient to support a conviction, we are guided by the following principles:

> On appeal, the test for a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact. *State v. Ildefonso,* 72 Haw. 573, 576, 827 P.2d 648, 651 (1992); *State v. Tamura,* 63 Haw. 636, 637, 633 P.2d 1115, 1117 (1981). " 'It matters not if a conviction under the evidence as so considered might be deemed to be against the weight of the evidence so long as there is substantial evidence tending to support the requisite findings for the conviction.' " *Ildefonso,* 72 Haw. at 576–77, 827 P.2d at 651 (quoting *Tamura,* 63 Haw. at 637, 633 P.2d at 1117). " 'Substantial evidence' . . . is credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion." *See id.* at 577, 633 P.2d 1115, 827 P.2d at 651 (quoting *State v. Naeole,* 62 Haw. 563, 565, 617 P.2d 820, 823 (1980)).

*State v. Matias,* 74 Haw. 197, 207, 840 P.2d 374, 379 (1992). "Furthermore, 'it is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence[.]' " *Tachibana v. State,* 79 Hawai'i 226, 239, 900 P.2d 1293, 1306 (1995) (citation omitted).

### B. Conclusions of Law.

> We review the trial court's [conclusions of law] *de novo* under the right/wrong standard. *Raines v. State,* 79 Hawai'i 219, 222, 900 P.2d 1286, 1289 (1995). "Under this . . . standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller,* 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Thus, a [conclusion of law] "is not binding upon the appellate court and is freely reviewable for its correctness." *State v. Bowe,* 51, 53, [sic] 77 Hawai'i 51, 881 P.2d 538, 540 (1994) (citation omitted).

*Brown v. Thompson,* 91 Hawai'i 1, 8, 979 P.2d 586, 593 (1999).

### C. Statutory Interpretation.

> "The interpretation of a statute is a question of law reviewable *de novo*.["] *Franks v. City & County of Honolulu,* 74 Haw. 328, 334, 843 P.2d 668, 671 (1993).

> When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

> When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

> In construing an ambiguous statute, the meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning. HRS § 1–15(1)(1993). Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool.

*Gray v. Administrative Dir. of the Court,* 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (internal citations, quotation marks, brackets, ellipses, and footnote omitted).

This court may also consider "the reason and spirit of the law, and the cause which induced the legislature to enact it[ ] . . . to discover its true meaning." *Id.* at 148 n. 15, 979 P.2d 586, 931 P.2d at 590 n. 15; HRS § 1–15(2) (1993).

Also, this court is bound to construe statutes so as to avoid absurd results. *Keliipuleole v. Wilson,* 85 Hawai'i 217, 222, 941 P.2d 300, 305 (1997). "A rational, sensible and practicable interpretation of a statute is preferred to one which is unreasonable[,] impracticable . . . inconsisten[t], contradict[ory], and illogical[ ]." *Id.* at 221–22, 941 P.2d at 304–05 (original brackets and citation omitted) (brackets added).

*Amantiad v. Odum,* 90 Hawai'i 152, 160–61, 977 P.2d 160, 168–69 (1999).

## III. Discussion.

### A. Offensive Touching or Physical Contact.

■ On appeal, Pesentheiner first argues that the mere act of knocking Takahashi's hat off does not constitute "touch[ing] another person in an offensive manner or subject[ing] the other person to offensive physical contact" within the meaning of HRS § 711–1106(1)(a). Pesentheiner urges us to interpret HRS § 711–1106(1)(a) as requiring a threshold showing that the defendant touched the accosted individual's person, arguing that mere contact with an appendage to a police officer's uniform is not sufficiently proximate to one's body to constitute either

touching or physical contact for purposes of HRS § 711–1106(1)(a).[1]

In analyzing whether the harassment statute's "touch" or "contact" prohibitions apply to Pesentheiner's conduct, we must "ascertain and give effect to the intention of the legislature" by first looking to "the language contained in the statute itself." *Amantiad,* 90 Hawai'i at 160, 977 P.2d at 168. Under HRS § 711–1106(1)(a), a person harboring the requisite "intent to harass, annoy, or alarm any other person" commits the offense of harassment if that person (1) "[s]trikes, shoves, kicks, or otherwise touches another person in an offensive manner[,]" or (2) "subjects the other person to offensive physical contact."

The statute thus expressly proscribes contact with an individual's person by way of a "[s]trike[ ], shove[ ], kick[ ]," or other method of "touch[ing][.]" However, HRS § 711–1106(1)(a) also prohibits, in the disjunctive and alternatively, acts which "subject[ ] [another] person to offensive physical contact[.]"

On appeal, the State contends that Pesentheiner's conduct falls within the first of these prohibitions. We question this parsing of the statute. On its face, HRS § 711–1106(1)(a) strains to support a construction that defines the phrase "[s]trikes, shoves, kicks, or otherwise touches another person" as anything less than actual bodily contact, whether directly or indirectly through the clothing or other material intended to cover the body.[2] Such a construction would be contrary to the commonsense understanding imparted by the statute's choice of words.

That said, we move to examine whether Pesentheiner nonetheless violated the alter-

---

1. Pesentheiner styles this argument as an attack on the sufficiency of the evidence. However, because "[t]he interpretation of a statute . . . is a question of law reviewable de novo[,]" *State v. Kalama,* 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000), the district court's determination that Pesentheiner's striking of Officer Takahashi's hat constituted "an offense of [sic] touching" under HRS § 711–1106(1)(a) is "not binding upon the appellate court and is freely reviewable for its correctness." *Brown v. Thompson,* 91 Hawai'i 1, 8, 979 P.2d 586, 593 (1999).

2. The concept of indirect bodily touching is explicitly articulated elsewhere in the Hawai'i Pe-

nal Code. HRS § 707–700 (1993) defines "sexual contact" as the "touching of the sexual or other intimate parts of a person not married to the actor, or of the sexual or other intimate parts of the actor by the person, whether directly or through the clothing or other material intended to cover the sexual or other intimate parts." *See also* Model Penal Code § 250.4(4) comment (1980) (advising that the Model Penal Code subsection cognate with HRS § 711–1106(1)(a) "should be considered in connection with" the Model Penal Code section cognate with HRS § 707–700).

native prohibition of HRS § 711–1106(1)(a), against "offensive physical contact[.]" Pesentheiner argues that "offensive physical contact" should be strictly construed to mean only actual contact with or touching of another individual's person.[3] However, as stated above, the plain language of HRS § 711–1106(1)(a) makes clear that the statute already proscribes such actions in its first prohibition against "[s]trik[ing], shov[ing], kick[ing], or otherwise touch[ing] another person[.]"

As a general rule, "[c]ourts are bound to give effect to all parts of a statute, and ... no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all

words of the statute." *In re Doe,* 90 Hawai'i 246, 250, 978 P.2d 684, 688 (1999). In light of this consideration, it becomes apparent that "offensive physical contact" must constitute more than simply the "touch[ing][of] another person in an offensive manner" if the phrase in the disjunctive is to hold any independent meaning or effect.

■ We believe that "offensive physical contact" encompasses the conduct in question here, offensive contact that, while separate and apart from the various forms of actual bodily touching, nevertheless involves contact with an item physically appurtenant to the body.[4] We believe that such a construction is mandated by the plain meaning of HRS § 711–1106(1)(a), read in its entirety.[5]

3. Because Pesentheiner does not contest the district court's finding that his contact with Officer Takahashi's hat was "offensive" under HRS § 711–1106(1)(a), we do not visit that issue here.

4. In construing "offensive physical contact" to encompass offensive contact with items physically appurtenant to the body, we dismiss any concern that our reading of HRS § 711–1106(1)(a) produces an unconstitutionally vague result. A statute is impermissibly vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 2498, 147 L.Ed.2d 597 (2000). *See also Kalama,* 94 Hawai'i at 64, 8 P.3d at 1228 ("to comport with due process, penal statutes must inform a person of ordinary intelligence of what conduct is prohibited so that he or she may choose between lawful and unlawful conduct.") A vagueness challenge may also arise where a statute "authorizes or even encourages arbitrary and discriminatory enforcement[,]" *Hill,* 120 S.Ct. at 2498, by promoting application "on an ad hoc and subjective basis[.]" *Grayned v. City of Rockford,* 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). *See also State v. Gaylord,* 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (quoting *Grayned* with approval).

We believe that the first of these concerns is ameliorated by the fact that only physical contact that is offensive and intended to "harass, annoy, or alarm any other person" is prohibited under HRS § 711–1106(1)(a). Admittedly, "because we are '[c]ondemned to the use of words, we can never expect mathematical certainty from our language.'" *Hill,* 120 S.Ct. at 2498 (quoting *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294). However, we are unpersuaded that the particular words employed in HRS § 711–1106(1)(a) are so far removed from the lexicon of common understanding that they fail to offer adequate notice as to the general types of offensive actions that are prohibited in connection

with an intent to "harass, annoy, or alarm any other person." As has been the case in other vagueness inquiries, "[i]t is how the statute would be read by the layperson which guides our construction in criminal cases." *Kalama,* 94 Hawai'i at 65, 8 P.3d at 1229. We are confident that the harassment statute's wording, being neither novel nor hypertechnical, avails itself to a degree of comprehension that gives such a layperson reasonable opportunity to "choose between lawful and unlawful conduct."

For much the same reasons, we are also unconcerned that our construction of "offensive physical contact" authorizes or otherwise encourages arbitrary and discriminatory enforcement. Our interpretation of HRS § 711–1106(1)(a) in no way diminishes the burden upon law enforcement to clearly articulate some form of offensive touching or physically appurtenant contact intended to "harass, annoy, or alarm any other person," as a precondition of arrest for a violation of the statute. Like other penal statutes, HRS § 711–1106(1)(a) requires that the police exercise a degree of independent judgment when effectuating its provisions. We believe that the level of discretion accorded here is sufficiently qualified by our construction of the statutory language so as to render remote the likelihood that the law will be enforced on an *ad hoc* and subjective basis.

5. In arguing for his restrictive interpretation of HRS § 711–1106(1)(a), Pesentheiner cites the *Random House Webster's College Dictionary* for its definition of "contact" as "'a touching or meeting, as of two things or people' or as 'immediate proximity or association.'" Pesentheiner contends that this dictionary definition of "contact" indicates a common usage that is limited to actual bodily touching.

We disagree that a close reading of Pesentheiner's proffered definition necessarily mandates such a conclusion. To be sure, "associate" is

Moreover, we are confident that our construction of "offensive physical contact" furthers the statute's overall purpose of preserving peace by proscribing conduct that offends "one's psyche and mental well-being[.]"[6] *State v. Kupau,* 63 Haw. 1, 8, 620 P.2d 250, 254 (1980); Commentary on [HRS] § 711–1106. Pesentheiner's cabined interpretation, when taken to its logical conclusion, would nullify the application of the statute in those very instances in which society's interest in deterring and punishing provocative conduct would be most intuitively and intensely implicated. Indeed, conduct such as tugging at a person's shirttails, knocking off his eyeglasses, grabbing her necktie or pulling on his necklace, though arguably more provocative and damaging to the sensibilities than many instances of actual bodily touching, would conceivably fall outside the statute's scope were we to countenance Pesentheiner's construction of HRS § 711–1106(1)(a). That Pesentheiner's reading can-

not yield a "rational, sensible and practicable interpretation of [the] statute" is fatal to his construction of the subsection. *Amantiad,* 90 Hawai'i at 161, 977 P.2d at 169.

We further believe that our interpretation of HRS § 711–1106(1)(a) is consonant with our obligation to "read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose." *Amantiad,* 90 Hawai'i at 160, 977 P.2d at 168. When appraised in its entirety, HRS § 711–1106 criminalizes a broad spectrum of provocative conduct that is offensive to the sensibilities.[7] *See, e.g., State v. Burdett,* 70 Haw. 85, 91, 762 P.2d 164, 168 (1988) (HRS § 711–1106(1)(b) also seeks to "preserve public peace and order" by outlawing conduct which has an adverse "impact on one's psyche and mental well-being"); Commentary on [HRS] § 711–1106 ("Subsection (1)(a) ... contacts are prohibited, if done with requisite intent, in order to preserve the peace.

defined as, *inter alia,* the "join[ing][of] things together or connect[ing][of] one thing with another." *Webster's Third New International Dictionary* 132 (Philip Babcock Grove *et al.* eds., 1981) (brackets in the original omitted). However, the alternative term—"proximity"—is commonly construed as "the quality or state of being proximate, next, *or very near." Id.* at 1828 (emphasis added). Thus, while "contact" may indeed imply the "join[ing]" or "connect[ing]" of one individual's body with that of another in the form of actual bodily touching, the dictionary definition of the term also accommodates instances in which one's body may be "very near" to that of another. We hasten to add that a "resort to legal or other well accepted dictionaries ... [is but] one way to determine the ordinary meaning of certain terms not statutorily defined." *Kalama,* 94 Hawai'i at 63 n. 6, 8 P.3d at 1227 n. 6 (brackets in the original omitted).

6. We recognize that "the use of legislative history as an interpretive tool" is an informative means of distilling the policy intentions underlying a given statute. *Amantiad v. Odum,* 90 Hawai'i 152, 160, 977 P.2d 160, 168 (1999). However, the legislative history of HRS § 711–1106 is unfortunately silent as to the intended scope of subsection (1)(a). HRS § 711–1106 was enacted under chapter 11 of Act 9 of the 1972 legislative session, with the "touch" and "contact" language of subsection (1)(a) forming part of the harassment statute since its inception. *See* 1972 Haw. Sess. L. Act 9, § 1101, at 123. However, neither the House nor the Senate Standing Committee Report on House Bill No. 20, the legislative bill whose text Act 9 embodies, contains

more than a cursory mention of the harassment statute. *See* Hse. Stand. Comm. Rep. No. 20, in 1971 House Journal, at 784–89; Sen. Stand. Comm. Rep. No. 20, in 1971 Senate Journal, at 1067–79.

7. HRS § 711–1106(1) (Supp.2000) provides:

(1) A person commits the offense of harassment if, with intent to harass, annoy, or alarm any other person, that person:

(a) Strikes, shoves, kicks, or otherwise touches another person in an offensive manner or subjects the other person to offensive physical contact;

(b) Insults, taunts, or challenges another person in a manner likely to provoke an immediate violent response or that would cause the other person to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another;

(c) Repeatedly makes telephone calls, facsimile, or electronic mail transmissions without purpose of legitimate communication;

(d) Repeatedly makes a communication anonymously or at an extremely inconvenient hour;

(e) Repeatedly makes communications, after being advised by the person to whom the communication is directed that further communication is unwelcome; or

(f) Makes a communication using offensively coarse language that would cause the recipient to reasonably believe that the actor intends to cause bodily injury to the recipient or another or damage to the property of the recipient or another.

Subsection (1)(b) is likewise aimed at preserving peace.").

These wide-ranging prohibitions, which cover provocative and offensive conduct ranging from actual bodily touching to electronic communications, indicate that the statute was intended to confront the problem of harassment in a thoroughly comprehensive fashion. Given the catholic penal scheme employed, HRS § 711–1106 cannot reasonably be read to singularly exempt from its thoroughgoing prohibitory sweep offensive contact that is physically appurtenant to the body.

We are mindful that Hawai'i case law seems to treat a defendant's actual bodily contact with a victim as a form of offensive touching, or as a form of offensive physical contact, or as both. *See, e.g., State v. Stocker*, 90 Hawai'i 85, 91, 976 P.2d 399, 405 (1999) (a "slap across the face during an argument" constitutes "striking another person in an offensive manner" (brackets and ellipses omitted)); *State v. Hopkins*, 60 Haw. 540, 544–45, 592 P.2d 810, 813 (1979) ("offensive physical contact" occurred when the defendants "put their arms around the [victims'] waists and pulled them," after the victims repeatedly shunned the defendants' verbal advances); *State v. Sanchez*, 9 Haw.App. 315, 324, 837 P.2d 1313, 1318 (1992) (holding that substantial evidence supported the trial court's finding that the defendant "'did strike, shove; in other words, touched [the police officer] *and* did subject [the police officer] to offensive physical contact'" when the defendant "pushed" the police officer (emphasis added)).

To be sure, the defendants in *Stocker*, *Hopkins* and *Sanchez* all engaged in some form of actual bodily touching. The reviewing courts in those cases thus never had reason to fully examine the breadth of the "touch" or "contact" requirement of HRS § 711–1106(1)(a), and may therefore have employed the words "touch" and "contact" less deliberately than would have been the case had the defendants questioned the subsection's scope on appeal. Unlike *Stocker*,

*Hopkins* and *Sanchez*, the appellate posture of the present case makes that issue ripe for resolution.

We acknowledge that certain language used by the Hawai'i Supreme Court in *Kupau, supra*, may appear at first blush to lend credence to Pesentheiner's construction of HRS § 711–1106(1)(a). There, the supreme court observed that

> a crime can be a lesser included offense when a less serious injury or risk of injury is involved. In the case at bar, we do not believe that the injury resulting from harassment would be less serious than that received from assault in the third degree. Although harassment requires a physical touching, HRS § 711–1106 is concerned with the offensive nature of the touching to one's sensibilities. The impact of harassment is on one's psyche and mental well-being rather than bodily injury as in assault in the third degree. Since harassment and assault inflict different types of injury, we find that the injury received from harassment is not less serious than injury from assault in the third degree.

*Kupau*, 63 Haw. at 8, 620 P.2d at 254 (footnote omitted).

Admittedly, a parsed reading of the third sentence, taken in isolation, would perhaps suggest that the supreme court held that "harassment requires a physical touching[.]" We do not believe, however, that this particular choice of words represents, for purposes of this case, an intentionally definitive construction of HRS § 711–1106(1)(a) by the supreme court.[8] When the passage is read in context, it becomes apparent that the supreme court was there simply distinguishing between the respective injuries sustained under harassment and assault. We observe, in addition, that *Kupau* was a case in which there was actual bodily touching. Kupau had "grabbed [the victim] by the left shoulder, spun him around and then struck a blow to [the victim's] chest." *Id.* at 2, 620 P.2d at 251. In any event, we are confident that our current construction of HRS § 711–1106(1)(a) in no way disturbs *Kupau*'s hold-

---

**8.** Tellingly, Pesentheiner himself refrains from arguing that *Kupau* affirmatively impacts his reading of the harassment statute.

ing that "harassment is not a lesser included offense of assault in the third degree." *Id.* at 8, 620 P.2d at 254.

We are given similar pause by the Commentary on [HRS] § 711–1106, in pertinent part:

> Subsection (1)(a) is a restatement of the common-law crime of battery, which was committed by any slight touching of another person in a manner which is known to be offensive to that person. Such contacts are prohibited, if done with requisite intent, in order to preserve the peace.

*See also Nishi v. Hartwell,* 52 Haw. 188, 190, 473 P.2d 116, 118 (1970) (in this medical malpractice case, the supreme court stated that "[b]attery is an unlawful touching of another person without his [or her] consent."); *Ozaki v. Ass'n of Apartment Owners,* 87 Hawai'i 273, 289, 954 P.2d 652, 668 (App.1998). Though "not . . . evidence of legislative intent[,]" the commentary on the Hawai'i Penal Code is nonetheless "an aid to understanding the provisions of [the] Code[.]" HRS § 701–105 (1993). Hence our concern with the comment that the common-law antecedent of HRS § 711–1106(1)(a) was committed by "any slight touching of another person in a manner which is known to be offensive to that person."

We remain confident, however, that the thoroughly comprehensive scheme against provocative conduct and psychic injury embodied in the current harassment statute was meant to sweep up both the conduct at issue here as well as that addressed by the common-law antecedent of the statute, if indeed the latter excluded the former. Our understanding of this issue is informed by the admonition contained in the Commentary on [HRS] § 701–102, "that there are no common-law offenses in Hawaii."

The commentary's reference to "slight touching" itself suggests that the dichotomy we have drawn for purposes of analysis, between bodily touching and physically appurtenant contact, is not conceptually impermeable. For it is not too farfetched to suggest that in knocking a person's hat off, the perpetrator unavoidably and directly impacts that person's body, albeit slightly and only through the intermediation of the hat.

This semantic fuzziness dates back even to the progenitor of HRS § 711–1106(1)(a). Model Penal Code § 250.4(4) (Official Draft 1962) provided that "[a] person commits a petty misdemeanor if, with purpose to harass another, he . . . subjects another to an *offensive touching* [.]" (Emphasis added.). Then again, its commentary explains that "Section 250.4(4) proscribes any *offensive contact* with another's body *or clothing.*" Model Penal Code § 250.4(4) comment (1980) (emphases added).

Yet this imprecision is no defect, as the commentary on the Hawai'i Penal Code elsewhere suggests:

> It can, of course, be argued that the Code's formulation leaves an area of imprecision where preciseness is most needed. As in other areas of the Code, the limits of what can be made precise must be recognized. It has been said that the genius of the Model Penal Code, from which this Code is to a great extent derived, is demonstrated by its recognition of the limits of precision in statutory language.
>
> The characteristic spirit of the Code's draftmanship [sic] inheres in its adoption of the "Aristotelian axiom" that "it is the mark of the educated man to seek precision in each class of things just so far as the nature of the subject admits." When precision is possible, the Code is devastatingly precise. When precision is not possible, it is not sought, nor is there any pretense that it has been attempted.

Commentary on [HRS] § 705–500 (quoting Kurland, Religion and the Law 15 (1962) (footnotes omitted)).

Given the thoroughgoing scope of the harassment statute, and the myriad instances to which it fairly applies, we likewise do not aspire to, nor do we pretend, a feckless and unnecessary precision. We hold, quite simply, that the conduct at issue here is covered by HRS § 711–1106(1)(a), and covered quite fairly.

### B. The "Intent" Requirement of HRS § 711–1106(1)(a).

Pesentheiner next argues that the State presented insufficient evidence to prove that

he "inten[ded] to harass, annoy, or alarm" Officer Takahashi when he knocked his hat off. Pointing to his own testimony and that of his witness Bien, both characterizing his contact with Officer Takahashi's hat as accidental, Pesentheiner argues that he raised a reasonable doubt as to whether he acted with the required *mens rea.*

As a general matter, "evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction." *Stocker,* 90 Hawai'i at 90, 976 P.2d at 404. Pesentheiner's claim of insufficient evidence therefore requires us to determine whether, "viewing the evidence in the light most favorable to the State, there is substantial evidence to support the conclusion of the trier of fact." *Matias,* 74 Haw. at 207, 840 P.2d at 379. In other words, if there is "credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to reach a conclusion" of guilt, *id.,* this court must affirm the conviction.

■ Guided by these considerations, we conclude that the testimonies of Officers Takahashi and Colburn offered substantial evidence that Pesentheiner's conduct was intended to harass, annoy or alarm Officer Takahashi.

Specifically, Officer Takahashi testified at trial that as he and Pesentheiner approached the end zone, a disgruntled Pesentheiner started yelling, raising his hands and waving at the crowd in an effort to "steal the show." Officer Takahashi had refused to allow him to return to the stands to continue watching what was apparently a much-anticipated sporting event. Pesentheiner became visibly angry as Officer Takahashi began pulling him toward the exit with greater force. Pesentheiner then turned his attention away from the crowd towards Officer Takahashi, took a small step towards him, and swung at his head area, knocking his hat five to ten feet away.

Furthermore, Officer Colburn testified that Pesentheiner had a strong odor of an alcohol on his breath and that his speech was somewhat slurred. Both police officers also testified that Pesentheiner cursed at them

and became extremely unruly after he was arrested.

When the evidence is viewed in the light most favorable to the State, there was substantial evidence that Pesentheiner intended to "harass, annoy, or alarm" Officer Takahashi. Hence, his challenge to the sufficiency of the evidence must fail.

*C. The Trial Court's Finding of "Recklessness."*

■ For his final point on appeal, Pesentheiner argues that by using the word "reckless" to describe his conduct, the district court failed to heed the express *mens rea* requirement of HRS § 711-1106(1)(a)—the "intent to harass, annoy, or alarm any other person[.]"

The court ruled as follows:

Well, the Court's ready to rule and the defendant will rise. Rendering it's [sic] decision, the Court has a few findings to pass along. There's no question that we have an offense of [sic] touching here. The question's basically whether it's accidental or intentional cause [sic] there's definitely an offense of [sic] touching as the harassment provision requires.

Court has to look at the circumstances which [sic] the defendant places himself. He goes to the stadium, he drinks and to what extent, I'm not sure, but enough to cause him to go over into the field and put himself in a position where he has to be taken custodial-wise off the field by the officers who were employed to be there to observe the peace and secure the peace.

And at this point, the defendant elects to showboat to the crowd and starts waving his arms, or one of his arms. And the defendant, if at that point rather than knock the hat off this officer had accidentally scratched him with a fingernail or grazed him to an extent to open a wound with a wristwatch as he swung that hand, he'd be here for assault, and he'd be here for assault on a police officer performing his duties. And if he was found guilty of that, he'd be in jail for thirty days, mandatory.

But, he didn't, you know, cause injury to that officer, he knocked his hat off. Not injury in terms of a (indiscernible), but we know what kind of an injury (indiscernible) probably. But he knocked his hat off and that's what the harassment statute is focused on preventing. Preventing people from getting disorderly on a one-on-one contact rather than disorderly in terms of a crowd. And when you elect to wave your hands when you're being escorted off, you're as reckless as you would be in an assault case, and as far as this Court's concerned, intentional, whether it's specific intent or just general intent.

Consequently, the Prosecutor's met it's [sic] burden and I am gonna find that you're guilty of the charge for getting into a situation like that and conducting yourself like that. And I'm gonna impose a fine of a hundred dollars and that's it. It can come out of the bail.

The court's ruling raises genuine concern as to whether it properly applied the intent standard of HRS § 711–1106(1)(a) to the case below. Though the court referred to Pesentheiner's conduct as "intentional," we hesitate to place too great a weight on a singular, isolated utterance, when other language in the court's ruling clearly indicates an erroneous understanding of the requisite *mens rea.*

As Pesentheiner amply notes, most confounding in the court's analysis of his state of mind is its reasoning that "when you elect to wave your hands when you're being escorted off, you're as reckless as you would be in an assault case, and as far as this Court's concerned, intentional, whether it's specific intent or just general intent."

We agree with Pesentheiner that the court's use of the term "reckless" to describe his conduct puts his conviction in grave tension with the intent element of HRS § 711–1106(1)(a). While we acknowledge (as the court appeared to) that a reckless state of mind is minimally sufficient for an assault conviction,[9] nothing less than the "intent to harass, annoy, or alarm" specified in the harassment statute could suffice in this case.

Moreover, the court appeared to equate recklessness, willy-nilly, with both "specific intent" and "general intent" in reaching its conclusion of culpably intentional conduct. But again, a generally culpable state of mind simply does not comprehend the specific "intent to harass, annoy, or alarm any other person" specified in the harassment statute.[10] The court's indiscriminate allusion to both terms is therefore at odds with the very statutory language that it was responsible for applying in the proceedings below.

Moreover, while the court appeared to consider Pesentheiner's drinking, arm waving and showboating to the crowd as relevant to its determination of his state of mind, its ruling is devoid of any mention of the role Officer Takahashi's description of the *actus reus* may have played in its analysis, if any. Officer Takahashi's testimony that Pesentheiner turned away from the crowd, took a step towards him and swung his arm to

---

9. HRS § 707–712.5 (1993) provides, in pertinent part:

   (1) A person commits the offense of assault against a police officer if the person:
   (a) Intentionally, knowingly, or recklessly causes bodily injury to a police officer who is engaged in the performance of duty; or
   . . . .
   (2) Assault of a police officer is a misdemeanor. The court shall, at a minimum, sentence the person who has been convicted of this offense to imprisonment for no less than thirty days.

10. "General intent" is defined as follows:

   In criminal law, the intent to do that which the law prohibits. It is not necessary for the prosecution to prove that the defendant intended the precise harm or the precise result which eventuated.
   "Specific intent" is defined as follows:

   In criminal law, the intent to accomplish the precise act which the law prohibits; *e.g.* assault with intent to rape.
   *Black's Law Dictionary* 810 (6th ed.1990). Note, however, that "arguments concerning specific and general intent are no longer relevant" because Hawai'i has dispensed with such common law concepts "in favor of [the] four defined culpable states of mind" enunciated in HRS § 702–206. *Kalama*, 94 Hawai'i at 65, 8 P.3d at 1229; HRS § 702–206 (1993) (defining culpable states of mind as "intentional," "knowing," "reckless," and "negligent"). By clearly articulating the *mens rea* elements utilized by the penal code, HRS § 702–206 extirpates from any analysis of guilt or innocence reference to general or specific intent.

knock his hat off is the critical evidence of intentional conduct in this case. Absent this brief testimonial vignette, the remainder of the evidence is insufficient by itself to support a finding of intent. All that is left is a waving of the arms that was, at most and as the court apparently found, reckless.

Based on the foregoing, we must concede that the court's ruling demonstrates its genuine confusion as to the intent element of the harassment charge. In light of our considerable reservations, we would be remiss in allowing Pesentheiner's conviction to stand.

### D. What Is To Be Done?

■ With respect to fashioning the appropriate remedy, Pesentheiner urges us to reverse his conviction or, in the alternative, to vacate the district court's judgment and remand the case for retrial.

We are aware that a criminal defendant is protected from being retried for an offense whenever a jury "impliedly acquits" him of that offense by finding him guilty of a lesser included offense. *See. e.g., Whiting v. State,* 88 Hawai'i 356, 360–61, 966 P.2d 1082, 1086–87 (1998); *Price v. Georgia,* 398 U.S. 323, 329, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970); *Green v. United States,* 355 U.S. 184, 190–91, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957).

However, any analogous implication in this case that the court made a finding of fact inconsistent with guilt must founder. The court's erroneous assumption that recklessness was sufficient for conviction rendered it unnecessary, under that assumption, to go further in considering the evidence than a finding that Pesentheiner recklessly waved his arms. Had the court applied the correct *mens rea* standard in its consideration of the evidence, it would have been further required to assess the weight and credibility of Officer Takahashi's description of the *actus reus.* As we have observed, the court's ruling is devoid of any mention of the issue. Under these circumstances, we cannot say that the court made a definitive finding of fact, invariably inconsistent with guilt, that might bar retrial.

Instead, having concluded that sufficient evidence was adduced at trial to sustain the charge, we apply the usual rule for trial error:

[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g.,* incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct. When this occurs, the accused has a strong interest in obtaining a fair readjudication of his guilt free from error, just as society maintains a valid concern for insuring that the guilty are punished.

*State v. Hamala,* 73 Haw. 289, 293, 834 P.2d 275, 277 (1992) (brackets and typesetting in the original).

### IV. Conclusion.

For the foregoing reasons, the May 12, 1999 judgment of the district court is vacated and the case is remanded for retrial.